GRAND LODGE ANCIENT ORDER UNITED WORKMEN *v.* MODE.

Opinion delivered February 5, 1923.

1. INSURANCE—SUICIDE—EVIDENCE.—Evidence in an action on a fraternal benefit certificate *held* to sustain a finding that death resulted from suicide.

2. EVIDENCE—PRESUMPTION.—There is a presumption against death by suicide.

3. INSURANCE—DEATH IN DELIRIUM.—In an action on a fraternal benefit certificate reducing the amount payable in case of death

by suicide, except in "delirium resulting from disease," evidence *held* to show that deceased at the time he committed suicide was laboring under a delirium resulting from disease.

Appeal from Faulkner Circuit Court; *George W. Clark,* Judge; affirmed.

*D. G. Beauchamp,* for appellant.

*R. W. Robins,* for appellee.

McCULLOCH, C. J.     This is an action instituted against appellant, a fraternal benefit society, on a benefit certificate or policy of insurance, issued by appellant to Henry C. Mode, one of its members, the amount of the benefit being the sum of $1,000, payable on the death of the member to the appellees, three of his minor children, who sue by their guardian.

Henry C. Mode joined the society and received his benefit certificate on March 19, 1920, and came to his death on May 11, 1920, from a pistol shot wound which entered his right temple and went clear through his head.

The application for membership contained a stipulation, in accordance with the laws of the order, which reads as follows:

"I further agree that if, within two years after becoming a member, and the date of my certificate, my death shall occur by suicide, whether sane or insane, except in delirium resulting from disease, or while under treatment for insanity, then the only sum which shall be paid or which is payable to my beneficiaries named in my beneficiary certificate shall be the amount which I may have paid into the beneficiary fund of the order during the term of my membership."

Liability on the part of the society is denied on the ground that Henry C. Mode came to his death by suicidal act which did not fall within any of the exceptions stated above. In other words, the contention is that death resulted from suicide committed while not in delirium resulting from disease. On the other hand, the contention of appellees is that the evidence is sufficient to warrant

the finding, in the first place, that death did not result from suicide, and that, even if it was suicide, the act was committed during "delirium resulting from disease." It is conceded that the deceased was not under treatment for insanity, and that there had been no judicial declaration of insanity. There was a trial of the issues before a jury, resulting in a verdict in favor of appellees.

There is little, if any, conflict in the statements of the witnesses concerning the facts of the case, but there are conflicting contentions of the respective parties concerning the inferences which may be drawn from the testimony. Appellees contend that the evidence warranted a finding that deceased did not take his own life, and that, if he did so, he was laboring under delirium resulting from disease. On the other hand, counsel for appellant contends that the undisputed evidence shows that deceased committed suicide, and that there was no evidence at all that he was laboring under delirium at the time.

Henry C. Mode and his wife resided in their own home at 1819 Louisiana Street, in the city of Little Rock, at the time his death occurred. Mode owned the property, and lived in the lower story, but rented the upper story to Mr. and Mrs. Chaney. About one o'clock on the day in question Mrs. Chaney was on her sleeping-porch, and heard two shots fired below. Other witnesses heard the shots, and when the house was entered Mrs. Mode was found dead in the doorway between the kitchen and the sleeping-porch, and Mode himself was found in a dying condition, lying on the bed on the sleeping-porch. Mrs. Mode was shot through the head, and Mode was, as before stated, shot through the temple. Mode had a .45 calibre army pistol in his hand when found, and died within a few minutes after his condition was discovered. The pistol turned out to be one owned by Mr. Chaney, which was kept in a scabbard lying on top of a wardrobe trunk on the sleeping-porch upstairs. Mr. Chaney was not at home on the day in question, and did not testify as a witness in the case. Mrs. Chaney was a witness, and

she identified the pistol as one belonging to her husband, and stated that she did not know how it came into the possession of Mode.

Mrs. Chaney testified that on the day in question she went up town for awhile, and on her return a little after noon she stopped in the rooms below for a few words with Mrs. Mode, the wife of deceased. She testified that before she left that morning Mrs. Mode stated, in a conversation with her, that Mr. Mode was angry, and the witness stated that when she returned she saw Mode sitting on a trunk on the sleeping-porch, and his appearance was such that it excited her fears, and that she went upstairs and locked herself inside the sleeping-porch. She said that Mode had a set, angry, or mean look, as she expressed it, on his face. She testified further that Mode was an automobile mechanic, but had not been at work for several days or longer. This witness testified that Mrs. Mode was ironing at the time with an electric iron, and, when the witness discovered the body, after the firing of the shots, the iron was found in the kitchen, on the board, still heated, and had burned through the cloth on which it rested.

Mrs. Chaney testified that, after the shots were fired, when she came out on the sleeping-porch, she found in front of her door a sealed envelope addressed to Mode's brother at Conway, his former home; that she took the letter down stairs and laid it on the railing, where members of the police force, who came in a few minutes later, found it and picked it up. Captain Pitcock of the police force testified that he opened the envelope and found a letter therein signed by H. C. Mode, and addressed to his brother at Conway. He read the letter, and he and another police officer who heard the letter read testified concerning its contents. Proof was made that the letter had been lost. They testified that the letter spoke, in substance, of the writer preparing to commit some deed or leave for some place, and requested his brother to look after his children, and expressing the hope that they

would meet in heaven. The witnesses also testified that there was an inside envelope, on which was written the words, "fragments of our trouble," or "scraps of our trouble," and that on tearing open this inner envelope it was found to contain writings torn to fragments and in such small pieces that the writing on the paper could not be deciphered.

The proof shows that the two shots were fired a few minutes apart, and there were no sounds of voices heard, though one of the witnesses testified that after the first shot was fired he heard a sound like a body falling on the floor. A bullet hole was found through the pillow and mattress on the bed on which Mode's body was lying.

The shooting occurred, as before stated, in broad daylight, and the testimony of the various witnesses is conclusive of the fact that there were no other inmates in the house except Mode and his wife and Mrs. Chanev.

We are of the opinion that the proof is conclusive that the death of Mode resulted from his own act in firing a pistol shot through his head, immediately after having killed his wife.

There is, as we have often held, a presumption against suicide, but it is a rebuttable presumption, and we think that the presumption in this case has been entirely overcome by the undisputed proof. It is unnecessary to discuss in further detail the evidence in the case, but it would do violence to reason to say that, under the circumstances of this case, as proved, the death of Mode could have occurred in any other way except by his own act.

The further question arises whether or not there is enough testimony to warrant the conclusion that the act was committed by Mode while laboring under "delirium resulting from disease."

There are many reasons for believing that the act was not prompted by a sane and balanced mind. There are no sufficient reasons, in the first place, shown for the tragic homicide and the suicide which immediately fol-

lowed.   Little, if any, motive is shown, even if the testimony as to Mrs. Mode's statement to Mrs. Chaney, introduced by appellant, be held to be admissible. The manner in which the man attempted to communicate with his brother and the fragments of the writing inclosed in the envelope afford strong circumstances tending to show that the man's mind was unbalanced.

Insanity alone, however, is not sufficient to justify the suicide under the contract and to permit recovery on the policy. Whether sane or insane, the act must be done under delirium resulting from disease in order to justify recovery on account of death caused by suicidal act.

There is sufficient proof that deceased was suffering from the disease of diabetes. A physician at Conway, the former home of deceased, testified that he examined deceased about three weeks before the tragedy and found that he was suffering from diabetes. This physician also testified as an expert witness, and stated that the disease in question ordinarily affects the nervous system and brain of the sufferer, that the subject becomes emaciated, loses appetite, and develops many complications; that it causes nervousness, loss of sleep, and affects the eyesight. He stated that sometimes patients suffering from that disease will lapse into coma and frequently into delirium—that they have hallucinations. In other words, the witness stated that the disease frequently causes delirium and hallucinations.

According to this testimony, if the jury found that the deceased was laboring under delirium or some hallucination at the time he committed the suicidal act, it was the result of the disease described by the physician.

We must accept the word "delirium," as used in the policy or benefit certificate, in its ordinary sense. The word is defined as follows: "A morbid condition, often the result of fever, in which mental action is abnormally rapid, incoherent, and characterized by illusions, hallucinations, or erratic fancies; wandering of the mind."

Standard Dictionary. In another dictionary it is defined as follows: "A more or less temporary state of mental disturbance, which manifests itself by mental irritation and confusion, more or less transitory, delusions and hallucinations, disordered, senseless speech, and motor unrest; mental aberration; a roving or wandering of the mind. It occurs in insanity, but usually results from a fever or some other disease, from intoxication, or from injury." Webster.

There was evidence sufficient to justify the conclusion that the deceased was laboring under a delirium resulting from disease at the time he committed the suicidal act. His own conduct at the time and immediately theretofore manifests the elements of delirium, illusions or hallucinations, which, according to the testimony of the physician, resulted from his physical disease. The testimony of Mrs. Chaney is not against the theory of delirium on the part of the deceased, but, on the contrary, it supports that theory. She testified that when she last saw Mr. Mode, as she started upstairs, he was sitting on a trunk and was "staring at Mrs. Mode;" that he had "a rigid expression," and "looked mean, too." The jury would have been justified in believing that Mrs. Chaney misinterpreted the emotions of deceased as manifested by the expression on his countenance, but it justified the conclusion that those emotions were unusual and manifested a state of mind not normal.

There is other evidence in the case tending to show that Mode had been a sick man for several weeks, and we are of the opinion that the inference was justified that he was in a state of delirium, within the meaning of the policy, at the time he committed the homicidal and suicidal acts.

The only question urged on this appeal is that of the legal insufficiency of the evidence, and we are of the opinion that the evidence was sufficient to justify the finding of fact upon which the contract imposes liability. The judgment is therefore affirmed.